**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
────────────────────────────────

**CHARLES SILSBY, ET AL.,**

                              **Plaintiffs,**                    **12 Civ. 2307 (JGK)**

                                                                 <u>**OPINION AND ORDER**</u>

          **- against –**

**CARL ICAHN, ET AL.,**

                              **Defendants.**
────────────────────────────────

**JOHN G. KOELTL, District Judge:**

        This is an alleged securities fraud action brought on
behalf of a proposed class of investors in Dynegy, Inc.
("Dynegy").  The lead plaintiff, Stephen Lucas, brings a
consolidated putative class action suit on behalf of individuals
who purchased securities of Dynegy between July 10, 2011 and
March 9, 2012 (the "Class Period").  The plaintiffs allege that
various defendants made material omissions in connection with
Dynegy's attempt to restructure its assets in 2011.  The
plaintiffs allege that the asserted omissions violate Section
10(b) of the Securities Exchange Act of 1934 (the "Exchange
Act"), 15 U.S.C. § 78j(b), and Rule 10b-5, promulgated
thereunder, 17 C.F.R. 240.10b-5.  The plaintiffs also allege
that various Dynegy officers, directors, and shareholders are
liable as control persons under Section 20(a) of the Exchange
Act, 15 U.S.C. § 78t(a).

The defendants move to dismiss the Amended Class Action Complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  This Court has jurisdiction over the alleged Securities Exchange Act violations pursuant to 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.  For the reasons explained below, the defendants' motion to dismiss is **granted** and the current complaint is **dismissed**.

I.

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the allegations in the complaint are accepted as true, and all reasonable inferences must be drawn in the plaintiffs' favor. McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007).  The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient."  Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985).  A complaint should not be dismissed if the plaintiffs have stated "enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff[s] plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678

2

(2009).  While factual allegations should be construed in the light most favorable to the plaintiffs, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  Id.

A claim under Section 10(b) of the Securities Exchange Act sounds in fraud and must meet the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure and of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b).  Rule 9(b) requires that the complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007).  The PSLRA similarly requires that the complaint "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," and it adds the requirement that "if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1); ATSI, 493 F.3d at 99; see also City of Roseville Emps.' Ret. Sys. v. Energysolutions, Inc., 814 F. Supp. 2d 395, 401 (S.D.N.Y. 2011).

When presented with a motion to dismiss pursuant to Rule
12(b)(6), the Court may consider documents that are referenced
in the complaint, documents that the plaintiffs relied on in
bringing suit and that are either in the plaintiffs' possession
or that the plaintiffs knew of when bringing suit, or matters of
which judicial notice may be taken.  See Chambers v. Time
Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2000).  The Court can
take judicial notice of public disclosure documents that must be
filed with the Securities and Exchange Commission ("SEC") and
documents that both "bear on the adequacy" of SEC disclosures
and are "public disclosure documents required by law."  Kramer
v. Time Warner, Inc., 937 F.2d 767, 773-74 (2d Cir. 1991); see
also In re Bank of Am. AIG Disclosure Sec. Litig., __ F. Supp.
2d __, 2013 WL 5878814, at *1-2 (S.D.N.Y. Nov. 1, 2013).

II.

The following facts are undisputed or accepted as true for
purposes of the defendants' motion to dismiss.  Dynegy is a
publicly traded company and the third largest independent power
producer in the United States.  (Amended Class Action Complaint
("Am. Compl.") ¶ 3.)  Dynegy Holdings, Inc. ("Dynegy Holdings")
is a direct and wholly-owned Dynegy subsidiary that, until
September 1, 2011, owned all of Dynegy's operations.  (Am.
Compl. ¶¶ 4, 29.)

A.

In 2010, Dynegy began experiencing severe financial difficulties.  In October of that year, Dynegy disclosed that its "substantial leverage and forecasted negative free cash flow [were creating] a very challenging liquidity position over time" and that "[a]bsent significant improvements in BOTH commodity and financial/capital markets, operating as a stand-alone company [would involve] substantial risk to Dynegy stockholders."  (Am. Compl. ¶ 34 (second alteration in original).)  In its 2010 Annual Report, Dynegy disclosed that it and Dynegy Holdings had suffered net losses of $234 million and $242 million, respectively, in fiscal year 2010.  (Am. Compl. ¶ 33.)  The 2010 Annual Report stated that Dynegy's substantial debts might preclude it from servicing its financial obligations and also included a going-concern qualification from Dynegy's auditors, who expressed doubt about Dynegy's ability to continue as a going concern.  (Am. Compl. ¶ 33.)

In response to its financial difficulties, Dynegy created a Financial Restructuring Committee ("FRC") composed of several of Dynegy's directors.  (Am. Compl. ¶¶ 26, 41.)  The FRC's purpose was to conduct "a comprehensive review of Dynegy's various restructuring alternatives, including, . . . possible changes to the capital structure of Dynegy."  (Declaration of Douglas

Baumstein ("Baumstein Decl."), Ex. 1 at 18; see also Am. Compl.
¶ 41.)  By May 15, 2011, the FRC had "devised a multi-step plan
to reorganize Dynegy's business segments and reorganize and
restructure its debts." (Am. Compl. ¶ 43.)  Dynegy's Board of
Directors considered the FRC's restructuring plan at a meeting
on May 18, 2011, and continued discussing the plan at subsequent
meetings on June 15, 2011, June 28, 2011, and August 4, 2011.
(Am. Compl. ¶ 43.)

B.

    On July 10, 2011, Dynegy issued a press release announcing
that it would refinance its senior secured credit lines by the
end of July, 2011. (Am. Compl. ¶ 62.)  Dynegy described the
refinancing as "the initial step in the Company's operating and
financial restructuring," and represented that the refinancing
was intended to "provide a solid foundation for Dynegy to begin
addressing the financial challenges that have been magnified by
an environment of low commodity prices." (Am. Compl. ¶ 62.)
Dynegy also represented that "[t]he new financings, accompanied
by the modification of the Company's asset ownership structure,"
would, among other things, "improve Dynegy's financial
condition." (Am. Compl. ¶ 62.)  Dynegy also stated that the FRC
and the Board of Directors would "continue to work with
[Dynegy's] advisors in connection with additional potential debt

restructuring activities, which may include direct or indirect transfers of equity interests of [Dynegy Holdings] . . . and/or further reorganizations of [Dynegy] and/or various of its subsidiaries." (Am. Compl. ¶ 63.) In public disclosures filed with the SEC on July 11, 2011, Dynegy further disclosed that it might, after the refinancing was complete, "engage in transactions that increase the likelihood of [the Company's] estate or creditors challenging the [refinancing]." (Baumstein Decl., Ex. 2, Executive Summary ("Exec. Summ.") at 6.)

To facilitate its refinancing efforts, Dynegy attempted to reorganize its most valuable assets into "ring-fenced" silos, that is, into entities that would be protected from creditors in the event that Dynegy Holdings declared bankruptcy. (Am. Compl. ¶ 44.) This restructuring effort, (the "First Step Restructuring"), required transferring ownership of the Company's coal-powered facilities from Dynegy Holdings to Dynegy Coal Holdco, LLC ("CoalCo") and transferring ownership of the Company's gas-powered facilities from Dynegy Holdings to Dynegy Gas Holdco, LLC ("GasCo"). (Am. Compl. ¶ 44.) Dynegy Holdings would retain indirect ownership of both new entities through a newly incorporated holding company called Dynegy Gas Investments, LLC ("Dynegy Investments"). (Am. Compl. ¶ 44.)

On July 22, 2011, various creditors attempted to enjoin Dynegy's First Step Restructuring in the Delaware Court of Chancery. (Am. Compl. ¶ 66.) The plaintiff-creditors asserted claims for breach of contract and fraudulent transfer in the Delaware action. (Am. Compl. ¶ 66.) The court denied the creditors' application to enjoin the restructuring, and Dynegy completed the First Step Restructuring on August 5, 2011. (Am. Compl. ¶ 69; Baumstein Decl., Ex. 3 at 13.)

Dynegy disclosed the First Step Restructuring in its August 2011 Quarterly Report to the Securities and Exchange Commission ("SEC"). (Am. Compl. ¶ 72.) The Quarterly Report described each transaction involved in the First Step Restructuring and stated:

> The August 2011 reorganization represents [Dynegy's] first step in addressing [Dynegy's] liquidity concerns. . . . , [Dynegy] may participate in additional debt restructuring activities, which may include direct or indirect transfers of [Dynegy's] subsidiaries' equity interests . . . and/or further reorganizations of [Dynegy's] subsidiaries as well as other similar initiatives.

(Am. Compl. ¶ 72.)

C.

On September 1, 2011, Dynegy executed the next step in its restructuring, acquiring CoalCo from Dynegy Investments in exchange for an illiquid unsecured financial instrument called

an undertaking (the "undertaking").  (Am. Compl. ¶ 51.)
According to Dynegy, CoalCo had a fair value of approximately
$1.25 billion, and Dynegy represented that it provided "[t]his
value . . . to [Dynegy Investments] through . . . the issuance
of an undertaking to make proportionate payments at the times
that Dynegy Holdings is obligated to make payments of principal
and interest" under $1.1 billion of notes due in 2019, and $175
million of notes due in 2026.  (Am. Compl. ¶ 77.)  The
undertaking thus required that Dynegy make a stream of
designated payments on debt held by Dynegy Holdings without
requiring that Dynegy assume any of the debt held by Dynegy
Holdings.  (See Declaration of Nicholas Porritt ("Porritt
Decl."), Ex. A at 7.)

After Dynegy and Dynegy Investments completed their
exchange, Dynegy Investments assigned the undertaking to Dynegy
Holdings in exchange for a $1.25 billion promissory note.  (Am.
Compl. ¶ 52.)  In connection with the assignment, the
undertaking was amended to reduce Dynegy's payment obligations
under the undertaking in the event that Dynegy acquired or
retired any of the debt held by Dynegy Holdings.  (Am. Compl.
¶¶ 52-53.)  However, Dynegy ultimately declined to "relieve
Dynegy Holdings of any debt."  (Porritt Decl., Ex. A at 7.)

Dynegy announced the transactions executed in connection with the transfer of CoalCo (the "CoalCo transfer") on September 2, 2011 and disclosed the relevant documents to the SEC on September 8, 2011. (Am. Compl. ¶ 77; Baumstein Decl., Ex. 4 at 3-4.)  In additional disclosures to the SEC, made on September 15, 2011, Dynegy stated that "[i]t is possible that [Dynegy's] creditors and/or other parties may seek to assert a variety of claims against Dynegy . . . challenging some or all of the transactions . . . under state or federal law for, among other things, breach of contract, [and] fraudulent transfer or preference . . . ." (Baumstein Decl., Ex. 5, Exhibit 99.2 at 3.)  Dynegy also described the potential remedies that might be awarded to litigants who prevailed on claims that the CoalCo transfer was unlawful, including disgorgement and the transfer of CoalCo back to Dynegy Investments. (Baumstein Decl., Ex. 5, Exhibit 99.2 at 3.)  Dynegy cautioned that "no assurance [could] be provided that any such litigation would be resolved in [Dynegy's] favor." (Baumstein Decl., Ex. 5, Exhibit 99.2 at 3.)

D.

On November 7, 2011, Dynegy Holdings filed a voluntary petition for bankruptcy under Chapter 11 of the Bankruptcy Code. (Am. Compl. ¶ 59.)  The bankruptcy court subsequently granted a motion to appoint a Chapter 11 examiner for purposes of

10

reviewing the restructuring transactions in which Dynegy
Holdings was involved, and confirmed Susheel Kirpalani as the
Bankruptcy Examiner on January 12, 2012.  (Am. Compl. ¶ 60.)
Kirpalani issued his report on March 9, 2012, finding that
Dynegy had, through its restructuring, intended to "delay and
hinder" its creditors.  (Am. Compl. ¶ 84.)  Assuming insolvency—
and noting that although the Examiner viewed the assumption as
reasonable, "many of the conclusions reached [in the report]
would be different if Dynegy Holdings were, in fact, solvent[,]"
(Porritt Decl., Ex. A at 14)—Kirpalani stated that the CoalCo
transfer was an actual and constructive fraudulent conveyance.
(Am. Compl. ¶ 84.)  However, the Examiner found that there was
no intent to defraud or affirmatively deceive creditors under
the Bankruptcy Code because Dynegy set out the actual facts of
the relevant transactions in its public filings.  (Porritt
Decl., Ex. A at 123-24.)

     Dynegy vigorously objected to the Examiner's Report,
pointing out, among other things, that the effect of the
undertaking was to require Dynegy to make principal and interest
payments on debt of Dynegy Holdings that Dynegy Holdings would
otherwise be required to make, and that the satisfaction of
antecedent debt constitutes reasonably equivalent value based on
the face amount of the debt.  (Baumstein Decl., Ex. 7 at 49-50.)

11

Kirpalani's conclusions were never litigated in the bankruptcy action because Dynegy Holdings reached a settlement with its creditors.  (See Am. Compl. ¶ 86.)  On the day that Kirpalani issued his report, shares of Dynegy's common stock fell 35%.  (Am. Compl. ¶ 85.)

E.

The plaintiffs have not sued Dynegy or Dynegy Holdings in this action.  Instead, the plaintiffs have sued several individual defendants.  Defendant Robert Flexon is the President and CEO of Dynegy and a Director of both Dynegy and Dynegy Holdings.  (Am. Compl. ¶ 18.)  Defendant Clint Freeland is an Executive Vice President and the Chief Financial Officer of Dynegy.  (Am. Compl. ¶ 19.)  Defendant Kevin Holwell is an Executive Vice President and the Chief Operating Officer of Dynegy.  (Am. Compl. ¶ 20.)  Defendants Thomas Elward, Michael Embler, Vincent Intrieri, and Samuel Merksamer were Directors of Dynegy at all times during the Class Period.  (Am. Compl. ¶¶ 21, 23-25.)  Defendant E. Hunter Harrison also served as a Director of Dynegy, but for only a portion of the Class Period.  (Am. Compl. ¶ 22.)  Finally, Defendant Carl Icahn is a minority shareholder of Dynegy who held 14.8% of Dynegy's common stock at all times during the Class Period.  (Am. Compl. ¶ 17.)

12

F.

The plaintiffs allege that defendants Flexon, Freeland, and
Merksamer (together, the "10(b) Defendants"), violated Section
10(b) of the Exchange Act, and Rule 10b-5.  According to the
Amended Class Action Complaint, the 10(b) Defendants knew or
were reckless in not knowing of the alleged misstatements
regarding Dynegy's restructuring that are at issue in this
action and that were made in press releases, presentations, and
SEC filings.  (Am. Compl. ¶¶ 108-110.)

The plaintiffs allege that statements describing Dynegy's
refinancing and First Step Restructuring, made in July and early
August of 2011, were materially misleading because they omitted
information pertaining to the subsequent CoalCo transaction.
(Am. Compl. ¶¶ 65, 76.)  More particularly, the plaintiffs
allege that the 10(b) Defendants breached a duty to disclose
information regarding the CoalCo transfer in connection with the
July 10, 2011 press release, July 13, 2011 conference call, and
August 8, 2011 press release, conference call, investor
presentation, and Quarterly Report to the SEC.  (Am. Compl.
¶¶ 65, 76.)  Additionally, the plaintiffs allege that Merksamer
materially misrepresented Dynegy's restructuring plans to the
Delaware Court when, on July 25, 2011, he submitted an affidavit
asserting that Dynegy Holdings would continue to possess after

13

the First Step Restructuring those assets ultimately transferred to Dynegy in the CoalCo transaction.  (Am. Compl. ¶¶ 67, 70.)

The plaintiffs also allege that statements made in a September 2, 2011 press release, a November 14, 2011 SEC filing, and a March 8, 2012 SEC filing, were materially misleading for three reasons: first, because each failed to disclose that Dynegy Holdings was insolvent or nearly insolvent, second, because each failed to disclose that the CoalCo transfer was intended to delay and hinder creditors of Dynegy Holdings, and third, because each failed to disclose that the value of the undertaking ultimately assigned to Dynegy Holdings in exchange for CoalCo was substantially less than $1.25 billion.  (Am. Compl. ¶¶ 78, 80, 82.)

Finally, the plaintiffs allege that each of the defendants in this action violated Section 20(a) of the Exchange Act as a control person of Dynegy.  (Am. Compl. ¶¶ 113-114.)

III.

The defendants move to dismiss the asserted violations of Section 10(b) and Rule 10b-5 because the plaintiffs have failed to allege material misstatements or omissions and scienter.

Section 10(b), as effectuated by Rule 10b-5, makes it "unlawful for any person . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in

14

order to make the statements made, in the light of the
circumstances under which they were made, not misleading." 17
C.F.R. § 240.10b-5(b).  To state a claim under Section 10(b) and
Rule 10b-5, the plaintiffs must allege that the defendants, in
connection with the purchase or sale of securities, made a
materially false statement or omitted a material fact, with
scienter, and that the plaintiffs' reliance on the defendants'
action caused injury to the plaintiffs.  Ganino v. Citizens
Utils. Co., 228 F.3d 154, 161 (2d Cir. 2000); see also City of
Roseville, 814 F. Supp. 2d at 409.

        In this action, the plaintiffs do not allege that the
defendants misstated any facts pertaining to Dynegy's finances,
nor do the plaintiffs allege that the defendants made any
affirmative misrepresentations in describing the transactions
involved in Dynegy's refinancing or restructuring.  Rather, the
plaintiffs allege that the 10(b) Defendants made several
material omissions in connection with public statements
concerning Dynegy's refinancing and restructuring.

        An alleged omission of fact is material if there is "a
substantial likelihood that the disclosure of the omitted fact
would have been viewed by the reasonable investor as having
significantly altered the 'total mix' of information made
available."  Basic, Inc. v. Levinson, 485 U.S. 224, 231-32

                                15

(1988) (citation omitted).  "Put another way, a fact is to be
considered material if there is a substantial likelihood that a
reasonable person would consider it important in deciding
whether to buy or sell shares of stock."  Operating Local 649
Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC, 595 F.3d 86,
92-93 (2d Cir. 2010) (citation and internal quotation marks
omitted).

"[A]n omission is actionable under [federal] securities
laws only when the [defendant] is subject to a duty to disclose
the omitted facts."  In re Time Warner Inc. Sec. Litig., 9 F.3d
259, 267 (2d Cir. 1993) (citations omitted).  Even though Rule
10b-5 imposes no duty to disclose all material, nonpublic
information, once a party chooses to speak, it has a "duty to be
both accurate and complete."  Caiola v. Citibank, N.A., 295 F.3d
312, 331 (2d Cir. 2002).  "[A]n entirely truthful statement may
provide a basis for liability if material omissions related to
the content of the statement make it . . . materially
misleading."  In re Bristol Myers Squibb Co. Sec. Litig., 586 F.
Supp. 2d 148, 160 (S.D.N.Y. 2008).  However, corporations are
"not required to disclose a fact merely because a reasonable
investor would very much like to know that fact."  In re
Optionable Sec. Litig., 577 F. Supp. 2d 681, 692 (S.D.N.Y. 2008)
(quoting In re Time Warner Inc. Sec. Litig., 9 F.3d at 267); see

also <u>In re Bank of Am. AIG Disclosure Sec. Litig.</u>, 2013 WL 5878814, at *6.

A.

The 10(b) Defendants first argue that statements in which they accurately described Dynegy's refinancing and First Step Restructuring, and which they made in July and early August of 2011, were not materially misleading because of the alleged failure to disclose information pertaining to the subsequent CoalCo transfer.  According to the 10(b) Defendants, the alleged omissions could not have misled a reasonable investor because Dynegy's public disclosures sufficiently conveyed that further restructuring was likely, and that it might involve transactions precisely like the CoalCo transfer.

The Second Circuit Court of Appeals has held that disclosures broad enough to cover a specific contingency are sufficient to satisfy any duty to disclose the specific contingency.  <u>See</u> <u>Hunt v. Alliance N. Am. Gov't Income Trust, Inc.</u>, 159 F.3d 723, 730-31 (2d Cir. 1998) (disclosure that fund would invest in "[g]overnment guaranteed mortgage-related securities" sufficient to disclose investments in "collateralized mortgage obligations"); <u>see also</u> <u>Freeman Grp. v. Royal Bank of Scotland Grp. PLC</u>, 540 F. App'x 33, 36 (2d Cir.

17

2013) (summary order) (disclosures that identified fund exposure
to "certain U.S. securitizations of residential mortgages"
sufficient to disclose precise exposure to subprime mortgages);
In re Bank of Am. AIG Disclosure Sec. Litig., 2013 WL 5878814,
at *10 (disclosure that bank routinely faced litigation, and
that litigation risks were significant, increasing, and could
materially affect corporate finances, sufficient to disclose
particular threatened litigation).

       In this case, Dynegy made significant public disclosures
pertaining to its ongoing restructuring efforts.  Although the
plaintiffs argue that Dynegy's disclosures did not adequately
inform investors that its initial refinancing and restructuring
together constituted the first of two steps in a planned
restructuring process, Dynegy in fact disclosed in July 2011,
that its refinancing and restructuring were only "the initial
step in the Company's operating and financial restructuring."
(Am. Compl. ¶ 62.)  And although the plaintiffs contend that the
10(b) Defendants failed to inform investors that subsequent
restructuring might involve transferring assets from Dynegy
Holdings to another entity, Dynegy informed investors as early
as July 2011 that it would pursue "additional potential debt
restructuring activities" which might include "direct or
indirect transfers of equity interests of [Dynegy

Holdings] . . . and/or further reorganizations of [Dynegy]
and/or various of its subsidiaries." (Am. Compl. ¶ 63.)

Moreover, Dynegy publicly cautioned that subsequent
restructuring transactions could provoke litigation.  In public
disclosures filed with the SEC on July 11, 2011, Dynegy stated
that it might, after the refinancing was complete, "engage in
transactions that increase the likelihood of [Dynegy's] estate
or creditors challenging the [refinancing]." (Baumstein Decl.,
Ex. 2, Exec. Summ. at 6.)  On August 8, 2011, when Dynegy
disclosed the First Step Restructuring in its Quarterly Report
to the SEC, Dynegy again cautioned investors that it was
pursuing further restructuring, and that further restructuring
might affect assets and entities held by Dynegy Holdings.
Indeed, the Quarterly Report reiterated that:

> [T]he August 2011 reorganization represents [Dynegy's]
> first step in addressing [Dynegy's] liquidity
> concerns.  Over the next eighteen months . . .
> [Dynegy] may participate in additional debt
> restructuring activities, which may include direct or
> indirect transfers of [Dynegy] subsidiaries' equity
> interests . . . and/or further reorganizations of our
> subsidiaries as well as other similar initiatives."

(Am. Compl. ¶ 72.)

Dynegy's disclosures plainly conveyed to any reasonable
investor that Dynegy was in July and August of 2011
contemplating further restructuring that might involve removing
assets then under the control of Dynegy Holdings.  Dynegy made

19

clear that its restructuring might involve transferring assets from Dynegy Holdings to other entities and even warned that its restructuring efforts could provoke challenges from creditors. Because no reasonable investor could read Dynegy's disclosures without understanding that the Company was contemplating transactions like the CoalCo transfer, the 10(b) Defendants had no duty to disclose more.  See Freeman, 540 F. App'x at 36; Hunt, 159 F.3d at 731.

The plaintiffs contend that Dynegy's disclosures were insufficient to satisfy the 10(b) Defendants' duty to speak accurately and completely because, while the disclosures described the possibility of transactions like the CoalCo transfer, Dynegy had already decided to execute the CoalCo transfer when the disclosures were made.  While "half-truths— literally true statements that create a materially misleading impression—will support claims for securities fraud," Wilson v. Merrill Lynch & Co., 671 F.3d 120, 130 (2d Cir. 2011) (citations and internal quotation marks omitted), the plaintiffs have not plausibly alleged that the 10(b) Defendants uttered any half- truths because the plaintiffs have not alleged that Dynegy had resolved to execute the CoalCo transfer when the relevant statements were made.

20

The Amended Class Action Complaint alleges that the FRC
devised, by May 15, 2011, "a multi-step plan to reorganize
Dynegy's business segments and reorganize and restructure its
debts." (Am. Compl. ¶ 43.)  According to the Amended Class
Action Complaint, this plan involved shifting assets from Dynegy
Holdings to Dynegy, because the latter was free of debt and
could thus shield assets from creditors.  (Am. Compl. ¶ 43.)

The plaintiffs allege that Dynegy's Board of Directors
began considering the FRC's restructuring plan at a meeting on
May 18, 2011, and continued discussing the plan at subsequent
meetings on June 15, 2011, June 28, 2011, and August 4, 2011.
These allegations, however, do not plausibly allege that
Dynegy's Board of Directors adopted the second step of the FRC's
restructuring plan in advance of the disclosures upon which the
10(b) Defendants rely.  The relevant disclosures were made
between July 10, 2011 and August 8, 2011, and the Amended Class
Action Complaint contains no allegation that the Dynegy Board
had actually adopted the second step of the FRC restructuring
plan before August 8, 2011.  While the possibility of further
restructuring was plainly disclosed, until the Board actually
adopted the second step of the restructuring, contingencies
could plainly have prevented the subsequent transfer.  The
plaintiffs allege only that the CoalCo transfer was still being

21

considered on August 4, 2011, (Am. Compl. ¶ 43), and was
executed on September 1, 2011, the same day that the Dynegy
Board of Directors approved the transaction, (see Baumstein
Decl., Ex. 6 at 8.)  The transfer was promptly announced on
September 2, 2011.  (Am. Compl. ¶ 77.)  Accordingly, the
plaintiffs have not plausibly alleged that disclosures
pertaining to Dynegy's restructuring were rendered false or
misleading by the Company's deliberations with respect to the
CoalCo transfer.  See San Leandro Emergency Med. Grp. Profit
Sharing Plan v. Philip Morris Cos., 75 F.3d 801, 811 (2d Cir.
1996).

       In light of Dynegy's robust disclosure, the public
statements with respect to Dynegy's refinancing and First Step
Restructuring could not have misled a reasonable investor.
Moreover, the 10(b) Defendants had no obligation to disclose the
particulars of the CoalCo transfer, which was merely under
consideration and in any event consistent with Dynegy's stated
business goals.  Similarly, the plaintiffs have failed to allege
that Defendant Merksamer made a material omission when he
represented to the Delaware Court that Dynegy Holdings would
continue after the First Step Restructuring to possess those

assets ultimately transferred to Dynegy in the CoalCo transfer.[1] (Am. Compl. ¶¶ 67, 70; see also Porritt Decl., Ex. A at 2 (finding that Dynegy Holdings continued to own assets after First Step Restructuring).)  As a result, the plaintiffs have not alleged actionable omissions with respect to any statements regarding Dynegy's refinancing and First Step Restructuring.

## B.

The 10(b) Defendants next argue that statements made in the September 2, 2011 press release, and November 14, 2011 and March 8, 2012 filings with the SEC, could not have contained material omissions because of a failure to disclose that Dynegy Holdings was insolvent or nearly insolvent when Dynegy executed the CoalCo transfer.  (Am. Compl. ¶¶ 78, 80, 82.)  The 10(b) Defendants contend that the failure to apply the term "insolvent" to Dynegy Holdings in otherwise accurate disclosures regarding the CoalCo transfer cannot support a Section 10(b)

---

[1] Merksamer also argues that his representations are not actionable because they were not made "in connection with" the purchase or sale of securities.  Because Merksamer had no duty to disclose that Dynegy was considering the CoalCo transfer, it is unnecessary to decide whether Merksamer's statements to the Delaware Court were made in connection with the purchase or sale of a security under Section 10(b).

violation because the term insolvent is a characterization, not a material fact.[2]

Federal securities laws are designed to promote the disclosure of facts.  See, e.g., Kowal v. MCI Commc'ns Corp., No. 90 Civ. 2862, 1992 WL 121378, at *4 (D.D.C. May 20, 1992), aff'd, 16 F.3d 1271 (D.C. Cir. 1994).  The importance of disclosed facts, and any "characterizations of or conclusions drawn from those facts[,] are matters that are left to the judgment of investors."  Id.; see also Portannese v. Donna Karan Int'l, Inc., No. 97 Civ. 2011, 1998 WL 637547, at *13 (E.D.N.Y. Aug. 14, 1998); Goldberger v. Baker, 442 F. Supp. 659, 665 (S.D.N.Y. 1977).

The plaintiffs argue that Dynegy had a duty to disclose that Dynegy Holdings was insolvent when issuing public statements with respect to the CoalCo transfer.  However, the plaintiffs do not argue that Dynegy Holdings misstated or withheld any factual information regarding the financial

---

[2] The Amended Complaint never explains whether it is referring to insolvency as defined in the bankruptcy statute, namely, where the fair market value of liabilities exceeds the fair market value of assets, see 11 U.S.C. § 101(32)(A), or, alternatively, whether references to insolvency refer to the common law test of insolvency: "whether there is a general inability on the part of the debtor to pay its obligations as they become due in the regular course of business," Comp III, Inc v. Computerland Corp. (In re Comp III, Inc.), 136 B.R. 636, 639 (Bankr. S.D.N.Y. 1992).

condition of Dynegy Holdings.  Indeed, the plaintiffs explicitly pleaded that Dynegy made disclosures regarding the financial difficulties affecting Dynegy Holdings, as, for example, by disclosing in its 2010 Annual Report that Dynegy Holdings had suffered a net loss of $242 million in fiscal year 2010.  Dynegy also provided a consolidated balance sheet with its SEC Form 8-K dated September 8, 2011, and the plaintiffs have not explained what information in this statement was inaccurate.

Because Dynegy supplied investors with financial information from which investors could draw their own conclusions about whether Dynegy Holdings was solvent, the 10(b) Defendants had no duty to use the term "insolvent" when describing the financial condition of Dynegy Holdings at the time the CoalCo transfer occurred.  See Portannese, 1998 WL 637547, at *13 ("[C]ompany has no duty to disparage its own competitive position in the market where it has provided accurate hard data from which analysts and investors can draw their own conclusions about the company's condition and the value of its stock." (citation omitted)); Kowal, 1992 WL 121378, at *5 (company has no duty to characterize transaction where there is no allegation that defendants "concealed or misrepresented any data relating to the financial details" of the relevant transaction); Goldberger, 442 F. Supp. at 664

(company has no duty to disclose that terms of loans were unfair or inconsistent with company policy where complaint "does not allege that the terms of the loans were not disclosed or disclosed in a misleading manner").[3]

### C.

The 10(b) Defendants also argue, correctly, that the statements made in the September 2, 2011 press release, and November 14, 2011 and March 8, 2012 filings with the SEC, were not materially misleading based on a failure to disclose that the CoalCo transaction was motivated by a desire to delay and hinder creditors of Dynegy Holdings.  (Am. Compl. ¶¶ 78, 80, 82.)  The 10(b) Defendants had no obligation to accuse themselves of wrongdoing.  See, e.g., Richman v. Goldman Sachs Grp., Inc., 868 F. Supp. 2d 261, 273 (S.D.N.Y. 2012) ("The federal securities laws do not require a company to accuse itself of wrongdoing." (citation and internal quotation marks omitted)); In re Citigroup, Inc. Sec. Litig., 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004) (same), aff'd on other grounds sub nom.

---

[3] The defendants also argue that the plaintiffs have not plausibly alleged that Dynegy Holdings was in fact insolvent when the CoalCo transfer occurred.  Because the defendants had no duty to use the term "insolvent" in describing the finances of Dynegy Holdings, it is unnecessary to decide whether the Amended Class Action Complaint adequately pleads that Dynegy Holdings was insolvent when the alleged omissions occurred.

Albert Fadem Trust v. Citigroup, Inc., 165 F. App'x 928 (2d Cir.
2006) (summary order); Ciresi v. Citicorp., 782 F. Supp. 819,
823 (S.D.N.Y. 1991) (same) (collecting cases), aff'd, 956 F.2d
1161 (2d Cir. 1992).

　　　　In any event, the plaintiffs have not responded to the
10(b) Defendants' argument that the failure to disclose their
alleged intent to delay and hinder creditors is not actionable
under Section 10(b).  Accordingly, these claims are deemed
abandoned.  See, e.g., In re Dana Corp., 412 B.R. 53, 64
(S.D.N.Y. 2008); Katz v. Image Innovations Holdings, Inc., 542
F. Supp. 2d 269, 275 (S.D.N.Y. 2008).


                                D.

　　　　Finally, the plaintiffs allege that the 10(b) Defendants
failed to disclose in the September 2, 2011 press release, and
the November 14, 2011 and March 8, 2012 filings with the SEC,
that the "value of the 'undertaking' was substantially less than
$1.25 billion."  (Am. Compl. ¶¶ 78, 80, 82.)  The 10(b)
Defendants argue that there was no material omission.

　　　　The representations made with respect to the value of the
undertaking in the September, November, and March statements are
substantially identical.  In each statement, Dynegy represented
that it had concluded that the fair value of its acquired equity

                                27

stake in CoalCo was approximately $1.25 billion, and that Dynegy
had provided "this value" to Dynegy Investments in exchange for
the CoalCo assets through the issuance of the undertaking. (See
Am. Compl. ¶ 77; see also Am. Compl. ¶¶ 79, 81.)  In each of the
statements, Dynegy also disclosed that the undertaking required
that Dynegy "make proportionate payments at the times that
Dynegy Holdings is obligated to make payments of principal and
interest" under $1.1 billion of notes due in 2019, and $175
million of notes due in 2026.  (See Am. Compl. ¶ 77; see also
Am. Compl. ¶¶ 79, 81.)  It is undisputed that, in addition to
disclosing what the undertaking required in the statements to
which the plaintiffs object, Dynegy disclosed all material facts
and documents regarding the CoalCo transfer and, more
specifically, the undertaking.

Despite these substantial disclosures, the plaintiffs claim
that the failure to disclose that the undertaking was worth
substantially less than $1.25 billion was materially misleading
because the 10(b) Defendants made representations about the
value of the undertaking without performing a valuation.  With
respect to the September 2, 2011 and November 14, 2011
statements, this argument presents a close question.

The plaintiffs do not contend that Dynegy withheld or
misstated any material facts regarding the undertaking, or that

Dynegy performed and withheld the results of a valuation.
Moreover, the plaintiffs cite no authority for the proposition
that the 10(b) Defendants had an independent duty to perform a
valuation.  The 10(b) Defendants argue that, in light of these
facts, Dynegy was not required to perform a valuation of the
undertaking.  According to the 10(b) Defendants, the absence of
a duty to value the undertaking is dispositive because they
cannot be liable for failing to disclose information they had no
obligation to generate and did not otherwise possess.

The plaintiffs reply that once a party chooses to speak, it
has a "duty to be both accurate and complete." Caiola, 295 F.3d
at 331.  The plaintiffs argue that, although the 10(b)
Defendants had no obligation to characterize the value that
Dnyegy provided to Dynegy Investments through the undertaking,
the decision to do so gave rise to a duty to be accurate.
According to the plaintiffs, this duty required that a valuation
be performed, and its results be disclosed.  The plaintiffs
contend that the 10(b) Defendants cannot have satisfied this
duty because they did not perform a valuation.

The plaintiffs' position relies to some extent on a
strained reading of the September 2, 2011 and November 14, 2011
disclosures.  The disclosures explained that the approximate
"fair value" of the CoalCo equity stake was approximately $1.25

billion.  While the disclosures said that "this value" was
provided through the undertaking, the disclosures did not state
that the "value" of the undertaking was $1.25 billion.  And,
indeed, any reasonable investor could have looked at the facts
of the undertaking as disclosed and concluded that the "value"
of an undertaking to pay amounts equal to the principal and
interest of debt in the amount of $1.25 billion that came due at
various times over approximately fourteen years was worth less
than the face amounts of those payments.  Indeed, the Examiner
faulted Dynegy because the Examiner concluded that the "present
value" of the payments to Dynegy Holdings was worth only
approximately $860 million.  (Porritt Decl., Ex. A at 7.)

It is unnecessary to decide whether the description of the
undertaking in the September 2, 2011 and November 14, 2011
disclosures was misleading because of the failure to include a
present value calculation, despite the accurate factual
description of the undertaking, because, as explained below, it
is plain that the plaintiffs have failed to allege scienter with
respect to the disclosures, as well as with respect to the other
alleged omissions.

It is clear, however, that the plaintiffs have made no
plausible claim of an actionable omission in the March 8, 2012
SEC filing with respect to the value of undertaking.  This is so

because the plaintiffs acknowledge that Dynegy in fact disclosed in its March 8, 2012 filing that it had valued the undertaking at only $728 million.  (See Pls.' Mem. of Law in Opp. to Defs.' Mot. to Dismiss at 19; see also Porritt Decl., Ex. D at F-46.) Accordingly, the plaintiffs have failed to allege a plausible claim that the March 8, 2012 SEC filing was materially misleading because of a failure to disclose that the undertaking was worth substantially less than $1.25 billion.

IV.

The defendants argue that the plaintiffs' Section 10(b) and Rule 10b-5 claim should also be dismissed because the plaintiffs have not alleged facts supporting a strong inference of scienter.  The scienter required to support a securities fraud claim can be "intent to deceive, manipulate, or defraud, or at least knowing misconduct."  SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1467 (2d Cir. 1996) (internal citations omitted). The PSLRA requires that a complaint alleging securities fraud "state with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  Scienter may be inferred from (i) facts showing that a defendant had "both motive and opportunity to commit the fraud," or (ii) facts that constitute

"strong circumstantial evidence of conscious misbehavior or recklessness." ATSI, 493 F.3d at 99; see also City of Roseville, 814 F. Supp. 2d at 418-19 (same).

In order to plead scienter adequately, the plaintiffs must allege facts supporting a strong inference with respect to each defendant. See Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Trust Fund v. Arbitron Inc., 741 F. Supp. 2d 474, 488 (S.D.N.Y. 2010). "[I]n determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 323 (2007). A complaint sufficiently alleges scienter when "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id. at 324; see also Slayton v. Am. Express Co., 604 F.3d 758, 766 (2d Cir. 2010); In re Bank of Am. AIG Disclosure Sec. Litig., 2013 WL 5878814, at *16.

In this case, the plaintiffs allege scienter on both "motive and opportunity" and "conscious misbehavior or recklessness" theories. These theories are considered in turn.

A.

With respect to motive and opportunity, the plaintiffs argue only that Dynegy had a motive to make material

32

misrepresentations in describing its refinancing and First Step Restructuring.  The plaintiffs contend that Dynegy had a motive to conceal the Company's plans to transfer assets from Dynegy Holdings to Dynegy because the Company would not otherwise have been able to induce creditors to restructure various loans.  The plaintiffs offer no argument that any other party or non-party to this action had motive and opportunity to make the omissions alleged in the Amended Class Action Complaint.

The plaintiffs' argument that Dynegy was motivated to mislead its creditors does not support any inference that the defendants accused of primary violations—namely, Flexon, Freeland, and Merksamer—had the motive and opportunity to defraud Dynegy's shareholders.  The plaintiffs may not impute the motivations of Dynegy, a non-party corporate entity, to the individual defendants.  Rather, the plaintiffs must allege facts supporting a strong inference with respect to each defendant. See Arbitron Inc., 741 F. Supp. 2d at 488.

In any event, it is well-settled that plaintiffs seeking to allege scienter based on a defendant's motive and opportunity to commit fraud "must assert a concrete and personal benefit to the individual defendant[] resulting from the fraud." Kalnit v. Eichler, 264 F.3d 131, 139 (2d Cir. 2001).  In this case, the plaintiffs have not alleged any concrete and personal benefit to

33

any defendant.  The plaintiffs do not allege any sales of stock during the Class Period, nor do they identify any other specific means through which Flexon, Freeland, or Merksamer might have gained by the alleged fraud.  Indeed, the motive that the plaintiffs seek to impute to the individual defendants—a desire to capture value for Dynegy and its shareholders by negotiating more favorable credit arrangements and by restructuring assets—is a generic one insufficient to allege a defendant's motive and opportunity.  See, e.g., Chill v. Gen. Elec. Co., 101 F.3d 263, 268 (2d Cir. 1996) ("The motive to maintain the appearance of corporate profitability . . . will naturally involve benefit to a corporation, but does not entail concrete benefits." (citations and internal quotation marks omitted)); see also Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 196–97 (2d Cir. 2008) (desire to avoid disclosing impaired quality of collateral on various loans constitutes motive to maintain appearance of profitability and does not entail concrete and personal benefits); In re PXRE Grp., Ltd., Sec. Litig., 600 F. Supp. 2d 510, 532 (S.D.N.Y. 2009) (desire to maintain credit rating to raise money necessary for company's survival does not entail concrete and personal benefits), aff'd sub nom. Condra v. PXRE Grp. Ltd., 357 F. App'x 393 (2d Cir. 2009) (summary order); In re DRDGOLD Ltd. Sec.

Litig., 472 F. Supp. 2d 562, 570 (S.D.N.Y. 2007) (desire to
raise capital does not entail concrete and personal benefits).

   The plaintiffs have not pleaded facts suggesting that, as a
result of the alleged fraud, Flexon, Freeland, or Merksamer
stood to obtain any specific benefits that are not "either
generalized to all [defendants] or beneficial to all
shareholders." Kalnit, 264 F.3d at 142.  Accordingly, the
plaintiffs have not alleged that Flexon, Freeland, or Merksamer
had any legally sufficient motive to make the asserted
misrepresentations.

                                B.

   Where, as here, a defendant's motive to commit fraud is not
apparent, "the strength of the circumstantial allegations [that
a defendant consciously or recklessly misbehaved] must be
correspondingly greater." Kalnit, 264 F.3d at 142.  Plaintiffs
typically allege conscious or reckless misbehavior by pleading
with specificity that the defendants had "knowledge of facts or
access to information contradicting their public statements."
Novak v. Kasaks, 216 F.3d 300, 308 (2d Cir. 2000).  As the
Second Circuit Court of Appeals has explained, "[r]eckless
conduct is, at the least, conduct which is highly unreasonable
and which represents an extreme departure from the standards of
ordinary care . . . to the extent that the danger was either

                                35

known to the defendant or so obvious that the defendant must
have been aware of it." Chill, 101 F.3d at 269 (alterations in
original).  Because the plaintiffs allege fraudulent omissions,
rather than false statements, "it is especially important to
rigorously apply the standard for pleading intent." In re
GeoPharma, Inc. Sec. Litig., 411 F. Supp. 2d 434, 437 (S.D.N.Y.
2006); see also In re Bank of Am. AIG Disclosure Sec. Litig.,
2013 WL 5878814, at *16.  The plaintiffs do not allege a strong
inference of scienter based on Flexon's, Freeland's, or
Merksamer's alleged conscious or reckless misbehavior.

1.

The plaintiffs argue that they have alleged that Flexon,
Freeland, and Merksamer acted with fraudulent intent when, in
statements made during July and August of 2011, they failed to
disclose the CoalCo transfer.

With respect to the July and August statements, the
plaintiffs contend that Defendants Flexon, Freeland, and
Merksamer acted with fraudulent intent when making the relevant
statements because each had already acquired knowledge that
Dynegy intended to execute the CoalCo transfer.  However, there
are no particularized allegations that the 10(b) Defendants were
confronted with facts contradicting their public representations
in July and August of 2011 because there is no indication that

36

the Dynegy Board of Directors approved the CoalCo transfer until September 1, 2011.  Therefore, the plaintiffs have not sufficiently alleged that the 10(b) Defendants acted with conscious or reckless disregard for a known or obvious duty when they failed to disclose the potential CoalCo transfer.  <u>Cf.</u> <u>Chill</u>, 101 F.3d at 269-70.

2.

The plaintiffs argue that they have pleaded facts sufficient to support a strong inference that the 10(b) Defendants acted with fraudulent intent by failing to disclose in Dynegy's September 2, 2011 press release and November 14, 2011 and March 8, 2012 SEC filings that Dynegy Holdings was allegedly insolvent.  But the Amended Class Action Complaint fails to particularize any allegations against Defendants Freeland and Merksamer.  Indeed, the Amended Class Action Complaint alleges that the FRC, the Dynegy Board, and Dynegy's professional advisors did not undertake any solvency analysis at the time that the restructuring took place.

With respect to Defendant Flexon, the plaintiffs assert conclusorily that "Flexon believed that Dynegy Holdings was insolvent when he joined [Dynegy] in June 2011."  (Am. Compl. ¶ 91.)  But the plaintiffs have pleaded no facts in support of this conclusory allegation, which is insufficient to support the

37

required strong inference of scienter.  See 15 U.S.C. § 78u–
4(b)(2) (requiring that plaintiff "state with particularity
facts giving rise to a strong inference that the defendant acted
with the required state of mind").  Accordingly, the plaintiffs
have failed to allege with sufficient particularity that Flexon
acted with conscious or reckless disregard for a known or
obvious duty when he failed to characterize Dynegy Holdings as
insolvent in each relevant statement.  See Shields v. Citytrust
Bancorp, Inc., 25 F.3d 1124, 1129 (2d Cir. 1994) (allegations
that defendants knew reserves were inadequate and intentionally
concealed vulnerability of assets were "so broad and conclusory
as to be meaningless" and thus insufficiently particular to
support scienter (citation omitted)); Anwar v. Fairfield
Greenwich Ltd., 891 F. Supp. 2d 548, 554-55 (S.D.N.Y. 2012)
(allegations insufficiently particular to support scienter); see
also Feiner Family Trust v. Xcelera.com, Inc., No. 07 Civ. 1914,
2008 WL 5233605, at *5 (S.D.N.Y. Dec. 15, 2008), aff'd sub nom.
Feiner Family Trust v. VBI Corp., 352 F. App'x 461 (2d Cir.
2009) (summary order) (same).[4]

---

[4] Similarly, the plaintiffs have failed to allege specific facts
to support their abandoned claim that the 10(b) Defendants knew
that the CoalCo transfer was motivated by a desire to delay and
hinder creditors of Dynegy Holdings.

3.

Finally, the plaintiffs argue that they have alleged a strong inference that the 10(b) Defendants acted with scienter when they failed to disclose in the September 2, 2011 press release, and November 14, 2011 and March 8, 2012 SEC filings that the undertaking was worth substantially less than $1.25 billion.  However, plaintiffs typically allege conscious or reckless misbehavior by pleading with specificity that the defendants had "knowledge of facts or access to information contradicting their public statements."  Novak, 216 F.3d at 308. Moreover, the defendants must have knowledge of or access to contradictory facts at the time that the alleged misstatements are made.  See, e.g., In re PXRE Grp., Ltd., Sec. Litig., 600 F. Supp. 2d at 536; In re Marsh & Mclennan Cos., Inc. Sec. Litig., 501 F. Supp. 2d 452, 484 (S.D.N.Y. 2006).

In this case, the plaintiffs allege that the 10(b) Defendants knew that the undertaking did not have a "fair value" of $1.25 billion.  (Am. Compl. ¶ 90.)  However, the plaintiffs acknowledge that Dynegy did not conduct a valuation of the undertaking until it began preparing its March 2012 financial statements.  (Pls.' Mem. of Law in Opp. to Defs.' Mot. to Dismiss at 19.)  The plaintiffs have not sufficiently alleged that the 10(b) Defendants knowingly failed to disclose a

39

valuation, given that the plaintiffs concede a valuation was
prepared only after the public disclosures about which they
complain.  See, e.g., In re PXRE Grp., Ltd., Sec. Litig., 600 F.
Supp. 2d at 536; In re Marsh & Mclennan Cos., Inc. Sec. Litig.,
501 F. Supp. 2d at 484.[5]

     The plaintiffs' allegations are also insufficient to allege
a strong inference of scienter with respect to statements made
in Dynegy's March 8, 2012 Annual Report to the SEC.  In that
Report, Dynegy disclosed that the undertaking was worth only
$728 million.  (Porritt Decl., Ex. D at F-46.)  Because Dynegy
disclosed in its Annual Report the very information that the
plaintiffs claim was omitted from it, the plaintiffs cannot
allege that the 10(b) Defendants made an actionable omission in
the Annual Report, let alone that the defendants did so with the
required intent to defraud.

---

[5] The plaintiffs also allege that the defendants "actively
avoided" valuing the undertaking.  (Am. Compl. ¶¶ 8, 90.)
However, there are no particularized allegations that the
defendants and their professional advisors were aware of facts
that required them to conduct a present value calculation of the
undertaking, as opposed to setting out the facts of the
undertaking.  Moreover, the plaintiffs' allegation goes to an
alleged effort to deceive the creditors of Dynegy Holdings,
rather than the plaintiffs and other Dynegy shareholders, which,
as explained below, would be insufficient for purposes of
alleging scienter.

4.

The plaintiffs have also failed to allege scienter because they have failed to allege that the 10(b) Defendants intended through their alleged omissions to defraud Dynegy's shareholders.  The Second Circuit Court of Appeals has required that, to allege a Section 10(b) claim, plaintiffs plead facts "support[ing] an inference of an intent to defraud the plaintiffs rather than some other group." ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co., 553 F.3d 187, 198 (2d Cir. 2009) (citation omitted).  In ECA, the plaintiffs alleged that JP Morgan had concealed transactions with Enron in exchange for excessive fees from Enron.  553 F.3d at 203.  The Court of Appeals held that the plaintiffs had failed to allege that JP Morgan acted with the intent to defraud its shareholders because the purported scheme allowed JP Morgan to extract substantial fees from Enron and therefore benefited JP Morgan's shareholders at the expense of Enron's investors. Id.; see also Kalnit, 264 F.3d at 141 (intent in merger negotiations to defraud acquiring company did not sufficiently allege intent to defraud shareholders who benefited from more favorable acquisition terms).

The plaintiffs in this case allege schemes that were intended to benefit Dynegy's shareholders at the expense of the

41

creditors of Dynegy and Dynegy Holdings.  For example, the plaintiffs claim that the failure to disclose that Dynegy was contemplating the CoalCo transfer in July and August statements allowed Dynegy to negotiate more favorable credit arrangements. However, the plaintiffs do not explain how the alleged intent to improve Dynegy's position vis-à-vis its creditors could defraud Dynegy's shareholders.  Indeed, it appears that Dynegy's successful refinancing would have been beneficial to its shareholders.  (See Am. Compl. ¶ 72.)  Because the plaintiffs have not alleged facts supporting a plausible inference that the July and August omissions in any way defrauded Dynegy's shareholders, the plaintiffs have not alleged a strong inference of scienter with respect to those alleged omissions.  See ECA, 553 F.3d at 198.

Under ECA and Kalnit, the pleaded facts with respect to the 10(b) Defendants' failure to disclose that Dynegy Holdings was allegedly insolvent, and that the undertaking was worth substantially less than $1.25 billion dollars, also fail to allege plausibly that the defendants intended to defraud Dynegy's shareholders, and thus fail to allege a strong inference of scienter.  According to the plaintiffs, the 10(b) Defendants' failure to disclose that Dynegy Holdings was allegedly insolvent and that the undertaking was worth

42

substantially less than $1.25 billion dollars was intended to enable Dynegy to execute the CoalCo transfer and, in turn, to extract concessions from creditors of Dynegy Holdings. (Pls.' Mem. of Law in Opp. to Defs.' Mot. to Dismiss at 20). Indeed, the plaintiffs allege, and the Bankruptcy Examiner found, that the CoalCo transfer was intended to allow Dynegy to capture for its shareholders "any value attainable by acquiring Dynegy Holdings's bonds at a discount." (Porritt Decl., Ex. A at 4.)

This allegation is consistent with the Examiner's broader findings. The Examiner found that throughout Dynegy's refinancing, First Step Restructuring, and execution of the CoalCo transfer, "the Dynegy Inc. board favored paths that benefited Dynegy Inc. and its stockholders to the detriment of Dynegy Holdings and its creditors." (Porritt Decl., Ex. A at 5.) However, Dynegy's apparent desire to capture value for its shareholders, at the expense of the creditors of Dynegy Holdings, does not constitute intent to defraud Dynegy shareholders such as the plaintiff, nor does such a desire constitute extreme disregard for a known or obvious duty owed to Dynegy's shareholders. See ECA, 553 F.3d at 198; Kalnit, 264 F.3d at 141.

43

5.

The plaintiffs' allegation of scienter is also insufficient because the plaintiffs have failed to allege an inference of scienter that is "at least as compelling as any opposing inference one could draw from the facts alleged." Tellabs, 551 U.S. at 324.

Dynegy made robust disclosures concerning its refinancing and First Step Restructuring and concerning the CoalCo transfer. For example, when Dynegy announced its refinancing and First Step Restructuring on July 10, 2011, it cautioned that the FRC and Board of Directors would "continue to work with its advisors in connection with additional potential debt restructuring activities, which may include direct or indirect transfers of equity interests of [Dynegy Holdings] . . . and/or further reorganizations of [Dynegy] and/or various of its subsidiaries." (Am. Compl. ¶ 63.)  Dynegy made substantially similar representations in its August 2011 Quarterly Report to the SEC. (Am. Compl. ¶ 72.)

Dynegy also warned its shareholders that its attempt to restructure assets would increase its exposure to litigation. In public disclosures filed with the SEC on July 11, 2011, Dynegy disclosed that it might, after the refinancing was complete, "engage in transactions that increase the likelihood

44

of [Dynegy's] estate or creditors challenging the
[refinancing]." (Baumstein Decl., Ex. 2, Exec. Summ. at 6.)
Following the CoalCo transfer, Dynegy made additional
disclosures regarding its vulnerability to potential claims,
alerting investors to the possibility that its creditors might
seek to assert "a variety of claims against Dynegy . . .
challenging some or all of the transactions . . . under state or
federal law for, among other things, breach of contract, [and]
fraudulent transfer or preference." (Baumstein Decl., Ex. 5,
Exhibit 99.2 at 3.)  Indeed, Dynegy even described the potential
remedies that might be awarded to litigants who prevailed on
claims that the CoalCo transaction was unlawful, including
disgorgement and the transfer of CoalCo back to Dynegy
Investments. (Baumstein Decl., Ex. 5, Exhibit 99.2 at 3.)
Dynegy cautioned that "no assurance [could] be provided that any
such litigation would be resolved in [its] favor." (Baumstein
Decl., Ex. 5, Exhibit 99.2 at 3.)

    These disclosures plainly alerted investors to the risks
involved in Dynegy's restructuring efforts and, accordingly,
weigh heavily against scienter.  See, e.g., In re Bank of Am.
AIG Disclosure Sec. Litig., 2013 WL 5878814, at *17; In re UBS
AG Sec. Litig., No. 07 Civ. 11225, 2012 WL 4471265, at *15
(S.D.N.Y. Sept. 28, 2012).  The disclosures in this case support

45

a compelling inference that the omissions alleged in the Amended
Class Action Complaint resulted from the belief of the 10(b)
Defendants that Dynegy's public disclosures satisfied any duty
owed to the Company's shareholders.  That inference is far more
compelling than any offered by the plaintiffs.  Indeed, the
inference that any alleged omissions occurred because Flexon,
Freeland, and Merksamer reasonably believed that further
disclosures were unnecessary is underscored by the Examiner's
Report.  The Examiner explicitly found that there was "no
evidence of an intent to defraud or affirmatively deceive
creditor[s] because . . . Dynegy disclosed to the investing
public the August Refinancing and the Ring-Fencing transactions
on July 10, 2011 and disclosed the CoalCo transfer on September
1, 2011."  (Porritt Decl., Ex. A at 124.)

Similarly, there is no plausible inference of scienter from
the failure to disclose a present value of the undertaking when
the terms of the undertaking were set out and when any
reasonable investor could have determined whether a "present
value" finding was necessary.  The more plausible inference is
that Dynegy and its advisers concluded that such a valuation was
not necessary.

Because the plaintiffs have failed to allege a strong
inference of scienter, the plaintiffs' Section 10(b) and Rule
10b-5 claims must be dismissed.  See Tellabs, 551 U.S. at 324.[6]


V.

The plaintiffs also allege that the individual defendants
are liable under Section 20(a) of the Exchange Act, which
provides:

> Every person who, directly or indirectly,
> controls any person liable under any
> provision of this chapter or of any rule or
> regulation thereunder shall also be liable
> jointly and severally with and to the same
> extent as such controlled person to any
> person to whom such controlled person is
> liable . . . unless the controlling person
> acted in good faith and did not directly or
> indirectly induce the act or acts
> constituting the violation or cause of
> action.

15 U.S.C. § 78t(a).  "To establish a prima facie case of control
person liability, a plaintiff must show (1) a primary violation
by the controlled person, (2) control of the primary violator by
the defendant, and (3) that the defendant was, in some
meaningful sense, a culpable participant in the controlled
person's fraud."  ATSI, 493 F.3d at 108 (citation omitted).  In

―――――――――――――――

[6] Although the defendants also allege that the plaintiffs have
failed to allege loss causation, it is unnecessary to reach that
argument.

this case, the plaintiffs have not alleged a primary violation
of Section 10(b) and Rule 10b-5.[7]  Accordingly, the plaintiffs
have not satisfied the first element of a Section 20(a) claim,
and that claim must also be dismissed.

Moreover, the claim against Defendant Icahn must be
dismissed for the additional reason that the plaintiffs have
failed to plead facts supporting a plausible inference that
Icahn controlled the defendants who allegedly committed the
primary violations at issue in this case.  The plaintiffs argue
that Icahn exercised the control required under Section 20(a)
primarily through his status as Dynegy's largest shareholder and
through his control of two Dynegy Directors, whom Icahn employed
at a separate enterprise.[8]  Viewing holistically the indicia of

---

[7] The plaintiffs not only fail to allege that the 10(b)
Defendants committed a primary violation, but also fail to
allege that Dynegy committed a primary violation.  This is so
because the plaintiffs have generally failed to plead any
actionable omission.  Moreover, the plaintiffs have not pleaded
facts sufficient to support a strong inference of scienter with
respect to the individual defendants, and have not pleaded any
facts supporting an inference of scienter with respect to a non-
defendant whose intent can be imputed to Dynegy.  See Dynex
Capital, 531 F.3d at 195.

[8] The plaintiffs also allege that Icahn exercised control through
knowledge obtained when a company under his control entered into
merger agreement with Dynegy, and through the merger agreement
itself.  However, the plaintiffs acknowledge that the merger
agreement between Icahn's company and Dynegy collapsed.
Moreover, the plaintiffs fail to explain how mere knowledge of
Dynegy afforded Icahn meaningful control.  Accordingly, these

48

control alleged, see In re Adelphia Commc'ns Corp. Sec. &

Derivative Litig., 398 F. Supp. 2d 244, 262 (S.D.N.Y. 2005), the

plaintiffs' argument is without merit.

The Amended Class Action Complaint alleges that Icahn

possessed control for purposes of Section 20(a) because he

employed the two individuals that he nominated to Dynegy's Board

of Directors: Intrieri and Merksamer.  This allegation lends no

support to the plaintiffs' allegation that Icahn exercised

control over primary violators because Intrieri and Merksamer

were not working within the scope of their employment for Icahn

when acting in their capacity as Directors of Dynegy.  See Moss

v. Morgan Stanley Inc., 553 F. Supp. 1347, 1357-58 (S.D.N.Y.

1983); see also In re Global Crossing Sec. Litig., Ltd., No. 02

Civ. 910, 2005 WL 1907005, at *30 (S.D.N.Y. Aug. 8, 2005)

("Although it may be true in some general sense that it is

axiomatic that employers 'control' their employees . . . ,

pleading an employment relationship is insufficient to establish

agency between [the employer defendant] and its employees in

their capacities as directors of an independent corporation."

(internal citation and quotation marks omitted)).

The Amended Class Action Complaint also alleges that

Defendant Icahn held 14.8% of Dynegy's common stock.  However, a

allegations do not indicate that Icahn exercised any meaningful
control over any primary violators.

49

defendant's minority stock ownership is, in isolation, insufficient to allege control under Section 20(a).  <u>See</u> <u>In re Alstom SA Sec. Litig.</u>, 406 F. Supp. 2d 433, 489, 492 (S.D.N.Y. 2005) ("Minority stock ownership is not enough to establish control person liability, since minority stock ownership does not give the owner the power to direct the primary violator." (citations omitted)); <u>In re Global Crossing Sec. Litig., Ltd.</u>, 2005 WL 1907005, at *1, 13 (15.8% minority ownership insufficient to establish control of primary violator under Section 20(a)); <u>In re Deutsche Telekom AG Sec. Litig.</u>, No. 00 Civ. 9475, 2002 WL 244597, at *6 (S.D.N.Y. Feb. 20, 2002) (22% minority ownership insufficient to establish control of primary violator under Section 20(a)).

Therefore, the plaintiffs' Section 20(a) claim against Icahn must be dismissed for the additional reason that the plaintiffs have failed to allege sufficient facts to support a plausible claim that Icahn exercised the required control over a primary violator.

VI.

In a footnote, the plaintiffs have requested leave to file a Second Amended Class Action Complaint in the event that the Court grants the defendants' motion to dismiss the plaintiffs' Amended Class Action Complaint.  In support of their request,

50

the plaintiffs argue only that "the usual practice is to grant leave to amend the complaint." Ronzani v. Sanofi S.A., 899 F.2d 195, 198 (2d Cir. 1990) (citations omitted).

Federal Rule of Civil Procedure 15(a) provides that leave to file an amended complaint should be granted "freely . . . when justice so requires." Fed. R. Civ. P. 15(a)(2); see also Foman v. Davis, 371 U.S. 178, 182 (1962). However, the "futility of amendment" is often cited as a valid basis for denying leave to amend. See Foman, 371 U.S. at 182; Williams v. Citigroup Inc., 659 F.3d 208, 214 (2d Cir. 2011); see also Twersky v. Yeshiva Univ., __ F. Supp. 2d __, No. 13 Civ. 4679, 2014 WL 314728, at *17 (S.D.N.Y. Jan. 29, 2014).

In this case, the Court offered the plaintiffs an opportunity to replead after the defendants filed their motion to dismiss, but the plaintiffs declined. Now, the plaintiffs ask for leave to replead without proffering any facts that might address the deficiencies in their Amended Class Action Complaint. Absent any such proffer, repleading in this action would be futile. See Goodrich v. Long Island R.R. Co., 654 F.3d 190, 200 (2d Cir. 2011) ("[W]ithout any showing that the deficiencies in the complaint could be cured, we must conclude that repleading would be futile."). Accordingly, the plaintiffs' request for leave to replead is denied.

51

**Conclusion**

The Court has considered all of the remaining arguments of the parties.  To the extent not specifically addressed above, they are either moot or without merit.  For the foregoing reasons, the defendants' motion to dismiss is **granted** and the plaintiffs' Amended Class Action Complaint is **dismissed**.  The Clerk is directed to **enter judgment dismissing this action and closing the case.  The Clerk is also directed to close all pending motions**.

**SO ORDERED.**

**Dated:**     **New York, New York**
            **April 30, 2014**                        _____/s/_____
                                                           **John G. Koeltl**
                                              **United States District Judge**